A98A2237. CLEVELAND et al. v. ALBANY UROLOGY CLINIC, P.C. et al.
(509 SE2d 664)

Judge Harold R. Banke.

William G. Cleveland sued the Albany Urology Clinic, P.C. ("Albany Urology"), and one of its physicians, Timothy S. Trulock, M.D., for medical negligence, misrepresentation and deceit, battery, breach of contract, breach of warranty and guaranty of cure, and fraudulent concealment of Trulock's "illegal use and abuse of cocaine, substance abuse problem, and impairment." His spouse, Deloria Cleveland, asserted a loss of consortium claim. The Clevelands (collectively "Cleveland") claimed that Trulock negligently performed unnecessary surgery under general anesthesia for non-existent penile cancer and thereby exacerbated Cleveland's medical condition. Cleveland alleged that Trulock violated OCGA § 31-9-6.1 by failing to accurately disclose his condition, possible modes of treatment, material risks, alternative procedures and treatments, and his prognosis

without the surgery. Charles E. Horton, Jr., M.D., a board certified urologist, testified that Trulock breached the applicable standard of care in both his diagnosis and treatment of the 36-year-old Cleveland. According to Horton, the proper diagnosis of Cleveland's condition was Peyronie's Disease which could have been confirmed with diagnostic testing.[1] In Horton's expert opinion, as a result of Trulock's improper surgical treatment, Cleveland suffers from a "painful curvature of the penis on erection and resulting inability to have intercourse."

Prior to trial, finding the pleading defective under OCGA § 31-9-6.1 (a), the court dismissed the claim for battery. The court excluded evidence of a prior lawsuit against Trulock from which the jury might have inferred that Trulock's medical judgment had been impaired by the use and abuse of cocaine.

The jury determined that Trulock and Albany Urology had engaged in "fraud, misrepresentation, or concealment of material facts" but found in favor of the defendants on the medical negligence claim.[2] The jury awarded $650,000 in damages for Cleveland's pain, suffering, injuries, and medical expenses and $100,000 on the spousal claim. In a separate proceeding, the jury awarded $35,000 in punitive damages against the defendants.

Albany Urology and Trulock moved for judgment notwithstanding the verdict. They asserted that the claim for fraudulent concealment or misrepresentation was not supported by law or evidence because Trulock had no duty to disclose the fact that he was an occasional user of cocaine. They argued that there was no evidence that Trulock was under the influence of or was impaired by cocaine while treating Cleveland as his patient. They also contended that the loss of consortium claim was not supported by any evidence of proximate causation.

In reversing the jury verdict, the trial court held that because Trulock had no duty to disclose that he was using cocaine, the claim for fraud failed as a matter of law. The court also determined that the "evidence fails to support either a claim for loss of consortium or the requisite intent to harm that is essential to a claim of fraud." Cleveland appeals. *Held*:

1. Cleveland contends that the trial court erred in granting Tru-

---

[1] Peyronie's Disease is a condition of unknown origin resulting in fibrous collagen deposits which ultimately become calcified in the tunica of the penis secondary to an inflammatory process. It is a relatively benign condition which usually resolves itself and responds to conservative therapy using Vitamin E.

[2] The verdict form apparently combined two distinct claims alleged in Cleveland's complaint. In Count 2, Cleveland asserted a claim for misrepresentation and deceit on several grounds. In Count 6, Cleveland asserted a separate claim for fraudulent concealment premised solely on Trulock's failure to disclose his use and abuse of cocaine.

lock and Albany Urology's motion for j.n.o.v. In reviewing the grant of j.n.o.v., this Court must construe the evidence in the light most favorable to the party who obtained the jury verdict. *Peters v. Hyatt Legal Svcs.*, 220 Ga. App. 398, 400 (1) (b) (469 SE2d 481) (1996). Where there is any evidence to support the verdict, we must affirm. *Lee v. Newman*, 240 Ga. 483 (241 SE2d 241) (1978).

Notwithstanding the argument to the contrary, we find that the claim for negligent concealment is supported by law. It is well-settled that a physician and his patient share a confidential relationship. *Keenan v. Plouffe*, 267 Ga. 791, 794 (2) (482 SE2d 253) (1997). Where a confidential relationship exists, as here, a person's silence when he should speak, or his failure to disclose what he ought to disclose, is as much a fraud in law as an actual affirmative false representation. *Morris v. Johnstone*, 172 Ga. 598, 605 (158 SE 308) (1931). Moreover, " '[a] confidential relationship between the parties . . . lessens, if not negates, the necessity for showing active fraud.' (Cit.)" *Arnall &c. v. Health Svc. Centers*, 197 Ga. App. 791, 793 (2) (399 SE2d 565) (1990).

Where a patient suffers injury at the hands of a physician as a result of consent to treatment obtained through the physician's misrepresentation, non-disclosure, or concealment of a material fact which the patient has a right to know, the patient may recover damages for fraud. *Smith v. Wilfong*, 218 Ga. App. 503, 507 (2) (462 SE2d 163) (1995) (consent not valid if obtained by fraudulent misrepresentations of material facts). "Fraud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." OCGA § 51-6-1.

We recognized in *Composite Bd. of Med. Examiners v. Hertell*, 163 Ga. App. 665, 667-668 (3) (295 SE2d 223) (1982) that even absent any harm to the patient, a physician's act of forming a medical judgment while under the influence of alcohol or drugs "constituted a departure from the minimal standards of acceptable and prevailing medical practice." In fact, OCGA § 43-34-37 (a) (13) expressly authorizes the State Board of Medical Examiners to discipline licensed physicians who "[b]ecome unable to practice medicine with reasonable skill and safety to patients by reason of . . . use of alcohol, drugs, narcotics, chemicals."[3]

In this case, the nature and extent of Trulock's impairment and its alleged impact on his care of Cleveland were disputed issues of fact shielded from full disclosure by Trulock's reliance upon a constitutional privilege. During his deposition, Trulock repeatedly invoked his right against self-incrimination concerning whether he was using

---

[3] During the trial, Trulock admitted that he was currently being supervised pursuant to a "private consent order" entered in May 1996 by the Composite Board of Medical Examiners.

cocaine during the time he was diagnosing and treating Cleveland. When specifically asked whether he was using cocaine during the time he rendered professional services to Cleveland, Trulock responded, "I respectfully refuse to answer on the ground that my answer may tend to incriminate me." Similarly, when asked, "Did you use cocaine more than once a day or less than once a day during the time you were Mr. Cleveland's physician?" Trulock refused to answer.

At trial, Trulock selectively responded to questions about his cocaine addiction. Although Trulock did admit to using cocaine seven or eight times while treating Cleveland, he stated that figure was "just an estimate." When asked "When's the last time you used cocaine before you operated on Mr. Cleveland," Trulock conceded that he did not "have a clue." When asked, "We're not ever going to get you to tell us the whole truth about your cocaine use, are we?" Trulock answered, "No, sir."

From Trulock's privileged refusal to testify, the jury was entitled to draw an inference that Trulock was illegally using cocaine while rendering professional services to Cleveland. *Jordan v. State*, 195 Ga. App. 405, 406 (1) (393 SE2d 461) (1990). This unfavorable inference is "based upon an implied admission that a truthful answer would tend to prove that the witness had committed the act." *Simpson v. Simpson*, 233 Ga. 17, 20 (209 SE2d 611) (1974).

Trulock admitted that the use of cocaine could impair a physician's performance and could alter a physician's judgment and no evidence showed otherwise. When asked about the propriety of concealing his cocaine use from his patients, Trulock responded that "the patient should know any factor that will impact on their patient care." Yet, Trulock admitted that he never informed Cleveland that he was using cocaine during the time Cleveland was his patient.[4] Cleveland emphatically testified that he would not have consented to the surgery if Trulock's cocaine use had been revealed to him.

Trulock's office notes, Cleveland's medical records, and the consent form fail to show that Trulock considered a differential diagnosis of possible Peyronie's Disease. According to Todd S. Jarrell, M.D., the performance of surgery, as here, at that stage of the disease deviated from the proper standard of care. Jarrell testified that Cleveland's scar resulting from the surgery performed by Trulock could be responsible for a leftward curvature of his penis. According to Cleveland, he had never experienced the excruciating pain and the curvature problem until his first erection after Trulock operated. Cleve-

---

[4] About two years after the surgery performed here, Trulock suffered a cocaine induced seizure necessitating emergency hospitalization and subsequently entered a substance abuse program.

land testified that when he went to Albany Urology six months after the surgery to personally retrieve his medical records, Trulock admitted to him that it was possible that the surgery caused his problem.

Plainly, in providing treatment to Cleveland, Trulock held himself out to be a licensed, qualified urologist. Whether in so doing, Trulock's conduct amounted to a "failure to disclose" or fraudulent concealment necessitated jury determination. *Sutlive v. Hackney*, 164 Ga. App. 740, 742 (297 SE2d 515) (1982) (jury issue where breast implant patient alleged her physician wrongfully held himself out to be a licensed, qualified plastic surgeon and that this conduct amounted to a "failure to disclose" and a fraudulent misrepresentation).

In these circumstances, we believe the jury was entitled to resolve whether Trulock fraudulently concealed material facts from Cleveland, whether Trulock misrepresented himself as a qualified urologist, and whether by so doing Cleveland suffered damages. *Sutlive*, 164 Ga. App. at 742. Inasmuch as the record contains some evidence that Trulock exacerbated Cleveland's medical problems, we cannot say that the record is devoid of evidence of causation. *Atlanta Ob. & Gyn. Group v. Coleman*, 260 Ga. 569, 570 (398 SE2d 16) (1990) (jury's verdict must be restored where evidence is conflicting on causation issues). We find that when construed most favorably toward Cleveland, the record contains evidence supporting the verdict and the judgment entered thereon. *Peters*, 220 Ga. App. at 400 (1) (b). Therefore, we reverse. *Griffin v. Kangaroo, Inc.*, 208 Ga. App. 190, 191 (1) (430 SE2d 82) (1993).

Notwithstanding the contrary claim, it was not necessary that Cleveland's wife testify since the record contains evidence to support her claim for loss of consortium. Damages for loss of consortium, like damages for pain and suffering, are general damages whose measure must be left to the enlightened conscience of the jurors. *Hightower v. Landrum*, 109 Ga. App. 510, 516 (5) (b) (136 SE2d 425) (1964). In making the award, jurors may take into consideration the nature of the services, society, and companionship affected as well as other circumstances. *Stubbs v. Harmon*, 226 Ga. App. 631, 633 (1) (b) (487 SE2d 91) (1997). Review of the instant record reveals no basis for upsetting the jury's determination on this claim. Id.

Notwithstanding the assertion to the contrary, the fraud claim was separate and distinct from any claim for medical negligence. *Boggs v. Bosley Med. Institute*, 228 Ga. App. 598, 600 (1) (a) (492 SE2d 264) (1997). A defense verdict on the medical negligence claim did not preclude a plaintiff's verdict on the fraud count. Id.

2. Cleveland contends that the trial court erred in granting the defendants' motion to dismiss Count 3, the claim for battery. The

court found that because the expert affidavit provided pursuant to OCGA § 9-11-9.1 failed to specifically set forth a violation of the Georgia Medical Consent Law (OCGA § 31-9-6.1), that affidavit was defective insofar as it applied to Count 3 (the claim for battery). We disagree.

When "an allegation for negligence" is premised on a violation of the informed consent law then "the expert's affidavit required by Code Section 9-11-9.1 shall set forth that the patient suffered an injury which was proximately caused by the surgical or diagnostic procedure and that such injury was a material risk required to be disclosed under this Code section." OCGA § 31-9-6.1 (d) (3). But a claim for battery faces no such procedural impediment because it is not "an allegation for negligence." Since the allegation was not grounded in professional negligence, no OCGA § 9-11-9.1 affidavit was necessary.[5] *Newton v. Porter*, 206 Ga. App. 19, 20 (424 SE2d 323) (1992). See *Hodge v. Jennings Mill, Ltd.*, 215 Ga. App. 507, 508 (451 SE2d 66) (1994); *Joiner v. Lee*, 197 Ga. App. 754, 756 (399 SE2d 516) (1990). Hence, the trial court erred in dismissing the battery count.

*Judgment reversed. Johnson, P. J., and Smith, J., concur.*

DECIDED NOVEMBER 19, 1998 —
RECONSIDERATION DENIED DECEMBER 28, 1998 

*William S. Stone, Thomas C. Earnest, Kevin R. Dean*, for appellants.

*Watson, Spence, Lowe & Chambless, Thomas S. Chambless, Dawn G. Benson, Donaldson, Bell & Pickett, George P. Donaldson III, Coleman, Talley, Newbern, Kurrie, Preston & Holland, Wade H. Coleman*, for appellees.

---

[5] Cleveland testified that Trulock stated: "This is simple. I'll make a half-inch incision. This little nodule is just under the skin in the fatty tissue and I'll give a half-inch incision. I'll give you a couple of stitches, and you'll be back to work Monday morning." Trulock did not inform Cleveland that he had never previously performed exactly this surgical procedure. The consent form does not mention Peyronie's Disease as an alternative diagnosis and fails to disclose disfigurement occurring during erection as a material risk. As the "practical alternative of this procedure" (to remove the lump from penis) the consent form offers no alternatives except: "do nothing and accept the consequences of the patient's medical condition." Compare disclosures required by OCGA § 31-9-6.1 (a) (1)-(6).